HERBERT HUBSCHMAN, complainant,

*v.*

ALICE HUBSCHMAN, defendant.

[Decided June 20th, 1946.]

---

*Messrs. Siegler & Siegler (Mr. Irving Siegler,* of counsel), for Herbert Hubschman.

*Messrs. Rossbach & Rossbach (Mr. Adam T. Rossbach,* of counsel), for Alice Hubschman.

VAN WINKLE, A. M.

There are two issues, one as to the validity of a decree of divorce obtained by the woman against the man in Florida, and the other as to the custody of the young child of the parties who is now in the custody of the man against the will of the woman.

1. I have determined, on the first of the issues, that the man, the actor, has unclean hands, and so should be repelled from this court of equity and denied the relief he seeks, namely, a decree of this court declaring the Florida decree void because, as he alleges, the woman was not domiciled in Florida.

However, I prefer not to rest my decision entirely on my application of the clean-hands maxim; and I have gone into a consideration of the testimony and the law. The result therefrom is that I have determined that the Florida decree should not be set aside even if the man should be held to be in court with clean hands.

The man wrote a letter to the woman admitting that he had been continuously guilty of adultery; and in this letter he stated that he had been "a cheat and a liar for a long time." In the letter he stated: "I feel that even if I attempted to terminate this affair, I probably wouldn't and if I did I would probably start another." The letter follows:

"March 20, 1941.

Dear Alice:

Because I don't intend to make your life any more unbearable, I think it is only fair to you to write this letter.

I have been a cheat and a liar for a long time, have committed adultery with one Mildred Meyer over a period of 2½ to 3 yrs, have stayed over night with her at certain tourist cabins on Route 25, N. J numerous times—

— . . I feel that even if I attempted to terminate this affair, I probably wouldn't and if I did I would probably start another. Because of this, I think that you have a perfect right to leave me to set up a place of your own or anything you may choose.

I will endeavor to support you and at present will forward you $160 per month, $60 to be applied toward the mortgage on the property at 501 - 503 - 505 Bergen St Harrison, the balance to—for your and our baby Alice.

Again I reiterate, that I solely am to blame for these events, and feel that for your own benefit and our childs you should leave me."

In a later letter by the man to the woman, undated but written in May, 1944, he wrote: "Am enclosing a little article I clipped from yesterday's paper; it may be good reading, I would mail it to the rest of your family when you are through." The enclosure was an article of several pages from the *Sunday Mirror Magazine Section* of the day before the letter was written, the article being headed in the largest of type, Do ALL HUSBANDS CHEAT? The article was illustrated and had to do with "the passion slaying of play-girl Rita Costello in Staten Island, N. Y.;" and it may be characterized as a justification for unfaithful husbands. It was sent by the man to the woman apparently as a justification of his unfaithfulness as a husband to her. I quote from the beginning of the article:

"This is what passed through the mind of Rother's two-timed wife: 'There isn't a man in this courtroom who mightn't be in my Adam's fix. It's easy enough for you jurors and spectators to condemn—but show me one married man in five who never has cheated on his wife.'"

It may be said that not only has the man done evil, but worse, he excuses it.

I have quoted the first letter and from the second, not only because the letters show the foundation on which my finding of unclean hands rests, but also because they bear on the custody issue and that I may deal with them by reference in disposing of that issue.

The man alleged that he had written the first of the letters under duress; but there was no suggestion that he had so written the second letter; and we see that the reference in the second letter to its enclosure and the enclosure itself indicate at least that the admission of the commission of adultery in the first letter was truly made. Having seen the parties and heard the testimony I hold without any doubt that duress as to the first letter is not proved.

It was argued that there was no evidence, other than the letters, that the man had committed adultery; that there would need to be legal proof that he had actually committed adultery, before it could be held that his hands were unclean; and, moreover, that his iniquitous conduct, his adultery, was not connected with his act in bringing this suit to set aside the Florida decree or with the suit itself. I do not agree that these contentions are valid. I look on this suit by the man to set aside the Florida decree as involving "the same matter," "the same subject-matter," "the same transaction," as the proceeding brought by the woman for a divorce in Florida, namely, the status of the parties in connection with their marriage. And I determine that, in deciding the question of unclean hands, it may be held that the man has unclean hands in this suit to set aside the Florida decree, without the adultery specified in the man's first letter being proved as adultery would need to be proved in a suit for divorce on the ground of adultery. I think that if the fact of adultery appears, no matter by what medium or process, that its existence may be ground for a holding of unclean hands.

I have not considered—the question has not been agitated— whether the clean-hands maxim may be applied against the state, the public, the "third party" to a divorce suit, having in mind its interest in the Florida decree. This suit is not

a divorce suit but it has to do with the Florida divorce suit. I have not considered the question because of my holding that the Florida decree is a valid decree in this state.

2. Counsel for the man contended at first that the Florida decree should be set aside because it was obtained for a cause which allegedly occurred while the parties resided in this state. However, this contention has been disposed of by the recent decision of our Court of Errors and Appeals in *Giresi* v. *Giresi*, 137 *N. J. Eq.* 336; 44 *Atl. Rep.* (2d) 345, the showing in that suit being that the ground upon which the Nevada court had awarded a decree was not a valid ground for divorce under the laws of New Jersey (the proviso in *R. S.* 2:50–35; *N. J. S. A.* 2:50–35) ; and the holding being that "the declared policy of New Jersey must give way to the provision of the federal constitution that 'Full faith and credit shall be given in each state to the public acts, records and judicial proceedings in every other state,' if the decree of the sister state is entitled to full faith and credit."

This leaves for disposition the contention "that the Florida decree was obtained by fraud for the reason that the defendant had no actual legal residence or domicile in the State of Florida at the time she instituted her suit for divorce, and that her legal residence and domicile was in the State of New Jersey and her allegation of a Florida residence was purely feigned and fraudulently set up for the purpose of obtaining a divorce."

On this contention counsel cited *Giresi* v. *Giresi, supra.* However, we are to notice that the printed "Case" and the printed "Supplemental Case" in the *Giresi* suit (which I may say I have inspected) which were before the Court of Errors and Appeals on the appeal from this court contain nothing whatever showing that any inquiry was made or that any testimony was taken in Nevada; and the decision apparently was made because of this and because of the *sui generis* nature of a divorce suit—the public being a party to such a suit—namely, that "justice requires that full inquiry be made into the facts and circumstances of appellant's allegedly *bona fide* Nevada residence" to ascertain whether there was a fraud perpetrated upon the Nevada court; and the suit was remanded to this court for such inquiry. Here, in this suit,

there was, as I see it, an inquiry in the Florida proceeding of the character and to the extent required by the decision in the *Giresi* suit, of the facts and circumstances of the woman's residence or domicile in Florida.

We find that the complainant here, the defendant in the sister-state proceeding, which led to the Florida decree of divorce made October 2d, 1945, appeared by having his chosen attorney file an answer in the Florida proceeding in which he put in issue all the averments in the bill for divorce as to domicile, jurisdiction and cause of action; and, further, that the complainant participated in the proceeding by his attorney who cross-examined witnesses at length on the question of the plaintiff's domicile.

I do not see that we are helped in deciding the issue raised by the pleadings here by the declaration of counsel for one of the parties that the appearance of the defendant in the Florida proceeding was special in name or in form, or by the declaration of counsel for the other party that such appearance was general in effect.

Where a decree of divorce made by the court of a sister state is attacked because of the allegation that the plaintiff who obtained it was not domiciled in the sister state I take it that we are not to be concerned with the details of the legal procedure—which are usually different from our own—which led the court to an examination and subsequently a decree, if in fact there really was an inquiry, an examination, as to the domicile of the plaintiff which was participated in by the defendant there under an answer and appearance made by him—in short, if the defendant there by a pleading, an answer, contested the question of domicile and there actually was thereafter a contest on that question. See *Davis* v. *Davis,* 305 *U. S.* 32; 83 *L. Ed.* 26; 118 *A. L. R.* 1518.

The Florida decree is *res judicata* and so the complainant is estopped from questioning its validity here; it is entitled to full faith and credit here by virtue of the fact of the contest in the Florida court, and by reason of the "full faith and credit" provision of the federal constitution; and I will advise a decree dismissing the bill of complaint.

I should add here, that in appreciation of the *raison d'etre* of Mr. Justice Colie's opinion in the *Giresi Case, supra,* and

that of Mr. Justice Bodine in *Isserman* v. *Isserman,* 138 *N. J. Eq.* 140; 46 *Atl. Rep.* (2d) 799, I determined, in addition to determining that the Florida decree is valid in New Jersey as between the parties, that because of the fact of the litigation in Florida on the question of domicile, the complainant's participation therein, and his failure to prove a fraudulent domicile, that the decree is not against "the interest of the public." This feature was not directly adverted to by counsel.

Of course we should not expect to find in any decided case a precise rule declaring inclusively and exclusively what "the interest of the public" is. As Mr. Justice Bodine declared in the *Isserman Case, supra,* "The law in this class of cases seems to be settled as the facts in each instance develop." In this *Isserman Case* an oral hearing here on domicile was ordered. An examination of the printed "Case" on the appeal of this *Isserman Case* to the Court of Errors and Appeals shows why. It shows, apparently, a Nevada decree resting on a mere pretext. It discloses a demand by the appealing wife for an examination on the question of domicile in the Nevada court, and its denial; that her demand to be herself heard as a witness was denied; and pages and pages of affidavits set up a claimed situation of corruption on the part of her counsel in Nevada who were alleged to have improperly co-operated with her husband's counsel there which resulted in a dishonest decree—altogether, apparently, a situation against "the interest of the public," and certainly one concerning which there should be a proper examination in this court—an examination which apparently had been denied in Nevada.

Mr. Bishop (in 2 *Bish. Marr., Div. & Sep.,* § 664) states "The Limit" to the exercise of "the interest of the public:"

"The Limit—to the right of the public to be protected while thus disregarding the just and common practice of the court cannot be precisely defined by rule. The judge, keeping in view the precedents, with his 'conscience' always awake, should see that while the record parties are not deprived of the justice of the law, the public good, which suffers from every dishonest divorce, and from every one not as well within the spirit of the statute as its terms, is not sacrificed. A rule more exact than this does not appear to be in the nature of the case possible."

"The interest of the public" may override the rights of parties expressly given them by law where there is fraud as to domicile. However, not only must fraud be proved, but also where there is a substantial litigation on the question of domicile in a competent court of a sister state the question is not to be relitigated here "in the interest of the public."

**3.** As to the custody issue. This separate issue is to be decided, as I am deciding it, separately from the issue relating to the Florida decree. Even if the Florida decree did not exist and the parties were still husband and wife but found to be living in a state of separation and with the child an inhabitant of the state, a decision on a custody issue should and would be manifested by an order committing the child to the custody of the mother.

On the conclusion of the hearing counsel asked and agreed that an investigation should be made under the statute (*R. S.* 2:199–12) by Ann Rainey, probation officer-in-charge Chancery Court, for the probation officer of Hudson County; and further, that her report of the investigation might be used by me in coming to a decision.

In instructing Mrs. Rainey about an investigation, she was told not to interview the parties or any person who had testified on the hearing; and further, she was instructed to talk to the young child more than once and away from the parties and to interview the maternal grandfather of the child and also the good woman who has been temporarily caring for the child in the home of the child's father, and also the daughter of this woman who lives in the same house with her mother and the child of the parties—and who, as I had noticed, had been in the courtroom on the hearing but had not been called to testify, and I wondered why. See *Robinson* v. *Equitable,* 126 *N. J. Eq.* 242 (at *p.* 247); 8 *Atl. Rep.* (*2d*) 600; *Breheny* v. *Essex Co.,* 134 *N. J. Law* 129; 45 *Atl. Rep.* (*2d*) 700. Mrs. Rainey was also instructed to investigate the condition of the father's home and that of the maternal grandparents, which home the mother had proposed as a home for the child, it being her own home, should custody be awarded to her.

Obviously, the probation statute referred to indicates, at the least, that a judge of this court asking for a probation officer

investigation may use the report in deciding on the welfare of a child. Nevertheless, strictly speaking, such a report may not be legally used as any part of the basis for a decision except where the parties have so consented as here.

I determine, on the evidence produced on the hearing—and so irrespectively of Mrs. Rainey's report of investigation— that the child's welfare demands that its custody should be committed to its mother, with liberal visitation accorded to the father.

Ordinarily, a six-year-old girl is to be committed to the custody of its mother unless she be unfit. I do not recall any case where a commitment has been made otherwise. And where custody is in question of course the age and sex of a child are to be considered. Here, there is nothing wrong whatever alleged or appearing against the mother, who is devoted to her child. She has not acted adversely to the child's welfare in any way whatever. Her taking the child to Florida where she obtained employment and the decree of divorce may not be so characterized. Nor should I characterize the father's clandestinely taking the child back to New Jersey as in any way bearing on a decision on the question of custody.

An inference may be made from the mother's testimony that she came back to New Jersey from Florida because the father had brought the child back here. Indeed, she testified that if custody should be awarded to her she expected to return to Florida with the child. This testimony probably would have had some importance on the issue as to the validity of the Florida decree had my conclusion on that head not rested on the fact that there had been a contest and an examination on the question of domicile in the Florida court.

The correctness of the conclusion that custody should be awarded to the mother is somewhat confirmed by the display hereinbefore made of the letters written by the father which contain a revelation of his immoral conduct. But the correctness of the conclusion needs no such support, for without any consideration of the letters, it is clear that it is for the best interests of the child that its custody should be committed to its mother. A little girl, so young and frail as this one, needs and should have a woman's care; and, fortunately, she

has been cared for by the woman who occupies one of the apartments in the house where the child now is with its father. This woman's plans with respect to caring for the child are uncertain but I judge that she, a mother herself, who is friendly to both parties but who apparently thinks that the child should be with its mother, is but waiting for this issue of custody to be decided before relinquishing her care of the child.

The conditions of the home proposed by the mother, that is, her present home in a single-family house owned by one or both of her parents in a good residential neighborhood, are better than the apartment house conditions of the father, his apartment being in the house in a business neighborhood owned by the woman who is now caring for the child. This circumstance usually is not a vital factor on the question of custody but it is not to be minimized. The maternal grandparents are in the home proposed by the mother; the child lived there for a time when she was cared for by the maternal grandmother, whose testimony I heard, and the maternal grandmother is willing to care for the child while the mother is at work. The mother has worked for a long time and in the restaurant of the father and apparently she needs to work.

In view of the testimony, I think the order for custody should provide that presently the child is not to be taken out of the state except on the consent of both parents. However, the child is to be committed to the mother's custody with no restriction on the mother's going to Florida seasonally for work provided the maternal grandmother remains at her present home and is caring for the child there.

A visitation provision is to be settled after further hearing from the parties. However, as they have fully testified orally, the direction now is that the father state in writing to the court with details what visitation he thinks should be accorded to him, within ten days from the date of the delivery of these conclusions to his solicitors; and that within said ten days a copy of such statement is to be sent to the solicitor of the mother, whereupon she is to deliver her statement on the same head to the court, and at the same time is to deliver a copy thereof to the solicitors of the father.